UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:16-cr-00153 CDP |
| v. | ) | |
| | ) | |
| STUART B. MILLNER, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW Defendant Stuart B. Millner, by and through his undersigned counsel, and respectfully submits the following information for the Court's consideration related to Mr. Millner's upcoming sentencing:

As is clearly demonstrated by both the Presentence Report and the collection of letters in support accompanying this Memorandum, Stuart Millner's life should not be defined by the regrettable facts which bring him before the Court. After overcoming incredible life obstacles, for over 70 years Mr. Millner lead a life that all of us could admire. Sadly, late in his life, the company into which he had invested his heart and soul came upon hard times, and trying to stay above water, Stuart fooled himself into thinking he could right the ship. This misguided confidence led Stuart to take the wrong steps which brings him here today. Mr. Millner comes to this point with sincere remorse, fully accepting responsibility for his conduct, and acknowledging without hesitation his actions were wrong and unacceptable. Yet, as set out below, we submit when considering an appropriate sentence which is "sufficient, but not greater than necessary," his conduct does not necessitate a sentence of imprisonment.

1

In accordance with the calculations prepared by the United States Probation Office, the applicable Total Offense Level for Stuart is 30, with an advisory Sentencing Guidelines imprisonment range of 97-121 months. While we note that the Government and Defendant had disagreed as to the proper Guidelines range, we acknowledge even our calculations still provides a range of up to 60 months – the cap imposed by the plea agreement. Therefore, Mr. Millner does not contest the conclusions within the Presentence Report, since under either version we are seeking a significant variance of the Guidelines range.

We fully recognize that the Guidelines range is significant. However, the Government has agreed that we can seek a sentence of probation, and the United States Probation Office specifically noted that a variance from the prescribed guideline range may be warranted in this case based upon Stuart's history and characteristics, and the health of both he and his wife. While recognizing that straight probation is not permitted under the applicable statutes, as discussed below, given Stuart's contributions to this community, the nature of the offense, and his health and age, we respectfully request a downward variance in this case which would avoid incarceration. (Mr. Millner could be ordered to serve as little as a day in jail, followed by a term of supervised release.)

As courts across the country have recognized, the Sentencing Guidelines do not have the ability to account for who Stuart Millner really is, the value of his life outside of this case, the very real suffering and punishment he has already endured as a result of his misconduct, and the significant negative consequences he will suffer even without imprisonment. For this very reason, the Supreme Court, through a series of decisions, has made clear that the Guidelines are not mandatory and are not even to be presumed reasonable.

On behalf of Stuart Millner, we ask the Court to consider the many factors set out below which go beyond the cold numbers presented by the Sentencing Guidelines, and are important factors when considering an appropriate sentence pursuant to 18 USC §3553. In the Plea Agreement, the Government agreed to allow Mr. Millner to seek a non-custodial sentence[1], and as mentioned, the United States Probation Office noted that a variance from the prescribed guideline range may be warranted in this case. Therefore, we respectfully ask the Court to apply a downward variance in this case to reach a non-custodial sentence.

### A.    The Stringent Standard for Departures is No Longer Applicable.

The Supreme Court has gone so far as to point out that, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also *not to be presumed reasonable." Nelson v. United States*, 129 S.Ct. 890, 892 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Id*.

Guidelines departures and post-*Booker* variances are different. The most significant difference is that there are "cases that would not justify a departure under the Guidelines but which are appropriate for a variance." *United States v. Myers*, 503 F.3d 676, 684 (8th Cir.2007). "Factors ordinarily considered irrelevant in calculating the advisory guideline range, or in determining whether a guideline departure is warranted, can be relevant in deciding whether to grant a variance." *Chase*, 560 F.3d at 830.  *See* also, *United States v. White*, 506 F.3d 635, 644 (8th Cir.2007) (rejecting the government's argument that a sentence was unreasonable because a variance was based "in part of some factors ordinarily considered irrelevant in calculating the advisory guideline range.")

The Eighth Circuit has held that the district court can even depart by variance based on

---

[1] As noted by the Probation Office, because Mr. Millner has entered guilty pleas to Class B felonies, "probation" is not technically available.  However, several non-custodial options are worthy of consideration.

factors already considered by the Guidelines. *See, e.g.*, *United States v. Overby*, 696 F.3d 702, 706 (8th Cir. 2012) ("[W]e previously have allowed variances based on factors already taken into account by the advisory [G]uidelines, where the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance.") (internal quotations and citation omitted); *United States v. Franik*, 687 F.3d 988, 991 (8th Cir. 2012) ("We have previously rejected *Franik's* argument that the district court abused its discretion by considering factors used for other sentencing purposes in determining whether to impose a variance."); *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) ("[F]actors that have already been taken into account in calculating the advisory guideline range, such as a defendant's lack of criminal history, can nevertheless form the basis of a variance.")

**B.     The Eighth Circuit Has Recognized Age and Health as Permissible Factors Supporting Variances**

Stuart's failing health is addressed fully in Section F below. The law clearly permits the Court to consider this factor. The Eighth Circuit in *Chase* explained, "[i]n fashioning a 'sentence sufficient, but not greater than necessary,' 18 U.S.C. § 3553(a), district courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.'" *Chase*, 560 F.3d at 830 (citing *White*, 506 F.3d at 644 (quoting 18 U.S.C. § 3553(a)(1)).[2]  Specifically, the Court in *Chase* stated that "factors such as a ***defendant's age, medical condition***, prior military service, family obligations, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure." (emphasis added)  In *United States v. Ryder*, 414 F. 3d 908, 920 (8th Cir. 2005), the Eighth Circuit, in noting both age and health were valid sentencing considerations, highlighted §3553(a)(2)(D): "the need for the sentence imposed to

---

[2] In *Chase*, the Eighth Circuit also found, among other things, that *Chase's* lack of criminal history, even though already taken into account in calculating his advisory guideline range, could nevertheless have formed the basis for a variance."

4

provide the defendant with needed ... medical care ... in the most effective manner." (ellipsis inserted by Court). The Eighth Circuit has held, "§ 3553(a)(2)(D) explicitly states that the effective provision of necessary medical care is an appropriate factor for the district court's consideration in sentencing. The district court had the discretion to decide that it would be more efficient and effective for [the defendant] to receive treatment from his current healthcare provider." *United States v. Wadena*, 470 F. 3d 735, 739 (8th Cir. 2006). Even under the guidance of the Sentencing Guidelines, age and health are valid justifications for a downward departure to probation: "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." USSG ¶ 5H1.1, see also ¶ 5H1.4.

### C.     Non-Custodial Sentences Are Intended to be Appropriate.

As the Court is well-aware, importantly, Congress enacted 18 U.S.C. §3553 which clearly states "[t]he court shall impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph (2)." (emphasis added) Indeed, this "parsimony provision" embodies "the overarching goal in federal sentencing." *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011). Notably, § 3553(a)'s sufficient-but-not-greater-than-necessary clause sets an independent and certain limit on the sentence that a court may impose to meet the goals of sentencing. Therefore, a non-custodial sentence should be an available option in this case – particularly given that the Government agreed to allow Mr. Millner to seek probation.

Importantly, and on point to this case, the Supreme Court in *Gall v. United States*, 128 S.Ct. 586, 596 (2007), gave strong support for sentences of probation. The Court made special note that the sentencing courts must give consideration "to the substantial restriction of freedom involved in a term of supervised release or probation." Id. The Court further stated that "[p]robation is not granted out of a spirit of leniency .... As the Wickersham Commission said,

5

probation is not merely 'letting an offender off easily.'" *Id.*, at 595 n. 4 (quoting the Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). As the Supreme Court said, a sentence of probation still subjects individuals to "substantial restriction[s]" including that probationers may not leave the judicial district; change jobs without notifying (or receiving permission) from a probation officer; report regularly to a probation officer and must permit unannounced visits to their homes and various other "special conditions" imposed on an case-by-case basis." *Id.* at 596.[3]

---

[3] Other Courts have been equally clear that a sentence of probation itself or probation combined with some period of home confinement can be an appropriately severe punishment. *See, e.g.*, *United States v. Wadena*, 470 F.3d 735, 738 (8th Cir. 2006) (affirming downward variance from a Guidelines range of 18 to 24 months' imprisonment to five years of probation in light of the defendant's medical condition and the defendant's dependent child); *United States v. Coughlin*, Cause No. 06-20005, 2008 WL 313099 at *5-6 (W.D. Ark. 2008), (Relying on *Gall*, the Court sentenced the defendant to five years' probation, including 27 months of home confinement for fraudulent misappropriation of funds, wire fraud and filing false tax returns, noting that "[h]ome detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive."); see also *United States v. Desmond*, Cause No. 05 CR 729-4, 2008 WL 686779 at *3 (N.D. Ill. 2008) (finding that a probationary sentence which included home confinement to be "a significant  restriction" on the defendant's freedom); *United States v. Howe*, 543 F.3d 128, 130 (3d Cir. 2008) (affirming downward variance from Guidelines range of 18 to 24 months' imprisonment to probation on account of defendant's role as a "devoted husband, father, and son," and because defendant was "remorseful at sentencing"); *United States v. Baker*, 502 F.3d 465, 469 (6th Cir. 2007) (affirming downward variance from Guidelines range of 27 to 33 months' imprisonment to probation because of defendant's role in caring for his ill son and defendant's remorse); *United States v. Husein,* 478 F.3d 318, 335 (6th Cir. 2007) (affirming a "99.91% variance" to probation because defendant shared responsibility with his mother for caring for his father); *United States v. Flowers*, 946 F. Supp. 2d 1295, 1298 (M.D. Ala. 2013) (sentencing defendant to probation despite a Guidelines range of 8 to 14 months' imprisonment because the defendant suffered from untreated psychiatric disorders which affected his judgment and decision-making faculties); *United States v. Lovato*, 798 F. Supp. 2d 1257, 1259 (D.N.M. 2011) (imposing probation notwithstanding a Guidelines range of 21 to 27 months' imprisonment because defendant suffered from mental illness and a traumatic childhood in which she was beaten by her father); *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 U.S. Dist. LEXIS 44030, at *1, 18 (S.D.N.Y. June 6, 2008) (rejecting the Guidelines sentencing range of 18 to 24 months' imprisonment, and based on the § 3553(a) factors, sentencing the defendant to "time served, supervised release, and 200 hours of community service").  *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92

Following *Gall*, the Eighth Circuit had to significantly change its own view of sentences of probation/non-custodial sentences.

> The district court imposed a sentence of probation, and the government argues that the sentence is substantively unreasonable. Our precedents prior to *Gall* "routinely" rejected as unreasonable those variances that resulted in a sentence of probation when the guidelines recommend a term of imprisonment, *United States v. Soperla*, 494 F.3d 752, 755–56 (8th Cir.2007), in part because "probation is not merely a reduced sentence, but a different type of sentence altogether." *Id*. at 756 (citing 18 U.S.C. § 3561; USSG § 5B1 (intro. comment.)). The Supreme Court in *Gall*, however, emphasized that "[o]ffenders on probation are subject to several standard conditions that substantially restrict their liberty," 128 S.Ct. at 595, and affirmed a sentence of probation for a drug trafficker with an advisory guidelines range of 30 to 37 months' imprisonment. The Court also indicated that a sentence of probation would be permissible for a drug trafficking offense with a guidelines range of 30–37 months' imprisonment, if there were "compelling family circumstances where individuals [would] be very badly hurt in the defendant's family if no one is available to take care of them." *Id*. at 602 (internal quotation omitted).

*United States v. Lehmann*, 513 F. 3d 805, 808-09 (8th Cir. 2008).

And variances more significant than needed by Stuart have received Eighth Circuit blessing. In *United States v. Cole*, 765 F.3d 884, 886 (8th Cir. 2014), the defendant, convicted of mail and wire fraud, tax evasion and tax fraud of over $3 million, was facing a Guidelines range of 135-168 months, but received a downward variance to a sentence of probation. The Eighth Circuit affirmed this large variance finding that the sentencing decision was procedurally and substantively reasonable because the district court had noted, among other things, 1) the numerous restrictions *Cole* endured while on probation, and the "lifelong restrictions" she faces as a federal felon, 2) that "the probationary sentence would allow [the defendant] to work and earn money to make restitution to the victims of the fraud," and 3) that, with the probationary sentence, *Cole* would be less likely to commit further crimes as she "has a far greater likelihood of successful rehabilitation with family support and stable employment." While those particular

(1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

factors have less application to Mr. Millner, his health and age clearly make him a very poor candidate for time in a federal prison.

### D.    Downward Variances Are Commonplace.

As counsel has previously noted in other proceedings, a review of the sentencing practices of courts in the Eastern District of Missouri and across the country, as reflected in the U.S. Sentencing Commission's *Sourcebook of Federal Sentencing Statistics* http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2016 Sourcebook-2014, demonstrates that courts now take seriously the appropriateness of sentencing below the Guideline Range. Looking at the 2016 statistics from the Eastern District of Missouri, **over 52% of all defendants received a sentence below the Guidelines range.**  Table N-8, attached hereto as Exhibit 1.[4]  While certainly some of the reduced sentences were the result of motions filed by the Government (such as §5K1.1 motions), **well over half of all sentencing reductions were done by the court without support from the Government.** In other words, the Courts in the Eastern District of Missouri have clearly shown that they are not bound by the Guidelines or the desires of the Government.

### E.    Stuart's History and Characteristics, §3553(a)(1).

One clearly important factor for the Court's consideration is that Stuart has done some special things for those in need, and he has been a good, loyal and devoted friend, and an exemplary father, in a world where those qualities are far less common than we would hope.

### 1.    Stuart's Unique Childhood

Stuart's early childhood sounds in many respects like a fictional story. Few children come from an upbringing like Stuart's and are able to become such productive members of

---

[4] Other Circuits have even lower percentage of defendants being sentenced within the Guidelines, e.g., D.C. Circuit only 29% are sentenced within the Guidelines, Second Circuit only 28%, Third Circuit only 39%, Seventh Circuit only 36%.

society. Fatherless before he knew how to walk, he moved in with his grandparents because of his mother's mental illness.  He lived in their St. Louis duplex for five years, along with his mother and her two brothers.  When he was six, his mother remarried to Henry Millner. Henry adopted Stuart, but regrettably was physically abusive. When Stuart was eleven, Henry killed himself. Henry and Stuart's mother had two children, and when Henry took his life, Stuart's mother spiraled downward again, and much of the responsibility for caring for his siblings fell on Stuart.

Stuart's mom next took up with a Dr. Kohn. Then in November, 1953, at the age of 14, Stuart came home from school and found his little three year old brother and seven year old sister there, but not his mother. For unknown reasons, his mother and Dr. Kohn amazingly left and never came back.

Stuart eventually got a hold of his uncle. He and his brother and sister were taken to the Jewish Children's Home.  Stuart's two siblings remained in the Children's Home and Stuart was moved to a foster home with the Unell family.

Counting Stuart, there were 11 people living in the Unell's home.  Fortunately for Stuart, the Unell's were a very compassionate family. Regrettably, prior to the Unell's, Stuart has no recollection of ever being told "I love you."

2.    Stuart's Perseverance

Reflecting an incredible fortitude, Stuart got through high school and attended Washington University his freshman year.   He attended the University of Missouri his sophomore year, and then after spending his junior and senior years back at Washington University, Stuart graduated from college with honors. Stuart married his first wife during college.

After graduation, Stuart joined his brother-in-law in the used machine tool business that his father-in-law had started many years before. They worked together for 16 years and built the business into one of the largest machine tool companies in the Midwest.  Municipal Tool & Machinery Company worked with several industrial auctioneers as a Joint Venture partner. Stuart personally fell in love with this kind of business and in 1981 he and his brother-in-law decided to start their own auction company.  It was called National Industrial Services, Inc. (NISI).  The company grew to be one of the largest industrial auction companies in the United States.  In 1986 it became apparent to Stuart that in order for the company to really grow, he had to become an auctioneer.  He went to auctioneering school and began to call his own auctions. During this timeframe, the company won major contracts from Fortune 500 Industrial companies.

In the early eighties, Stuart was introduced to Lee Kling, Chairman of the Democratic Finance Committee under Jimmy Carter.  He was from St. Louis and was forming a group of investors to buy four banks in the St. Louis area called First State Bancshares.  Stuart was part of the group of 20 that ended up buying the four banks.  Stuart became Chairman of the Board of Landmark Northwest Plaza, and was on the executive board of the holding company, Landmark Bancshares.  The bank group grew from a small group with assets of just over $200,000,000 to over $1,500,000,000 when it went public and was admitted to the New York Stock Exchange.   It was later sold to Magna Banks in the mid-1980's.

In 2001, Stuart started Stuart B. Millner & Associates (SBMA), a very successful business growing to a size of 15 employees. Then, in 2014, SBMA began to have financial difficulties. The challenges at first were small and appeared very manageable. However, as months went by, the projections Stuart had counted on to bring things back in the black did not

10

pan out.  Instead, the financial challenges got more difficult.  Stuart had always been successful in the auction business, and in his other businesses. He convinced himself that he could pull the company out of its problems. He was wrong. He was trying everything to make sure his customers were paid what they were owed. As the Court now knows, he tried too hard, made wrong decisions, and stands before you a broken and near-penniless man.

While Stuart's perseverance drove him to be a successful businessman, it is not where his perseverance has shone most brightly.  Stuart's youngest son Jason probably set it out best for the Court:

> After never having had a father or mother of his own, never having been part of a real family, he made his own and once again excelled. Raising hard working, humble, talented and most of all loving children. He instilled something in those children that he learned. Something that could never be taken from him and that could never be taken from them either. That same spirit he found in himself. He changed the mold. He didn't repeat the mistakes of his parents or take out his experiences on them as so many do. No, he wanted to give his children what he never had: Their dreams. And he did. Each one followed their passion and found success. A success he fostered and supported, even championed.

Stuart's compassion and ability to not allow his own devastating past to form who he was to become is also reflected in the letter from Mary and Ron Massey. Stuart had three elderly aunts - three relatives who "could have stepped up when he was abandoned." Yet, he loved them unconditionally, and cared for them in their advanced years.

3.      Stuart's Life Beyond His Business World.

Stuart has served on numerous not-for-profit boards:

- **_The Repertory Theatre of Greater St. Louis_**… he was a board member for seven years and a member of the executive committee.

- **_COCA (Center of Contemporary Arts)_**… he was a board member for over 10 years and served on its executive committee.

- ***Logos School***……he served on this board for seven years.  The school was a great place to help many kids that needed help or needed assistance with substance abuse.

- ***American Lung Association*** . . . he served on this board for over five years.

- ***First President of Green Trails Elementary School's PTA***

Stuart learned that in the world of non-profits, raising money from charity events was a very important, significant source of revenue.  His auctioneering skills (and a bit of the flair for the dramatic), enabled him to become the Featured Auctioneer for many organizations at their fund raising events. Among them;

- COCA….. over $1,000,000 raised

- American Heart Association

- American Lung Association

- The Barnes Jewish Hospital Group

- Logos School

- Teen Challenge

- The Catholic Charities

- American Cancer Society

- The Children's Hospital of Greater St. Louis

- The Masonic Temple Organization of St. Louis

- New City School

- Community School

- Crossroads School

- Friends of Kids with Cancer

Stuart's work with the various organizations was meaningful and recognized. The American Lung Association gave him the Outstanding Volunteer Award, and St. Louis Crisis Nursery gave him their Shining Star award. As Charlie Brennan said in his letter to the Court, "Unlike most professional auctioneers, Stuart always provided his services pro bono."

As reflected in the letter from Pastor Jerry Beers, when a small church in Steeleville was in need, Stuart stepped forward. Not only did he pay for all the Bibles placed in the church pews, but he also purchased a van to accommodate both the youth programs and to enable attendance on Sundays by the elderly of the church community.

Another example, he chaired an event for BJC entitled "A Field of Dreams."  The money raised from this event was to purchase for the hospital system the first "endoscopic ultrasound" unit at a cost of $250,000.  Besides being the auctioneer of the event, Stuart chaired the event that took over five months to create.  450 people attended and it raised all the money needed to purchase the unit.

As Ms. Riven said in her letter to the Court regarding Stuart's time as a Board member of COCA, "[h]e was generous and kind – both with his ideas, his time and his dollars."

Also, reflective of the true character of Stuart is the letter from Pastor John Wilson where he describes an offer and acceptance to head a church committee to lead the congregation into the future, meeting twice a week for three months in a row.

Any argument that Stuart's compassion is not so extraordinary would be wrong, but also irrelevant. After *Gall*, "a district court need not justify an extraordinary variance with an extraordinary or equally compelling justification...." *United States v. Townsend*, 618 F.3d 915, 921 (8th Cir.2010) (quoting *United States v. Clay*, 579 F.3d 919, 933–34 (8th Cir.2009)) (internal quotation marks omitted); *see also United States v. Bain*, 586 F.3d 634, 638 (8th

Cir.2009) ("[T]he district court committed *Gall* error by requiring extraordinary circumstances to justify the requested non-guidelines sentence."); *United States v. Smith*, 573 F.3d 639, 660 (8th Cir.2009) ("*Gall* made clear that we may no longer require extraordinary circumstances to justify a sentence outside the Guidelines range[.]" (citation an internal quotation marks omitted)); *United States v. McGhee*, 512 F.3d 1050, 1052 (8th Cir.2008) (per curiam) ("[W]e understand the Court's opinion in *Gall* also to preclude a requirement of extraordinary circumstances to justify an extraordinary variance[.]" (citation an internal quotation marks omitted)).

### F.     Mr. Millner's Advanced Age and Health.

Stuart is 77 years old. As with many men his age, he has a collection of different health issues, some big, some smaller, but when combined, they create a daily challenge for him. First, Stuart has been a diabetic for over ten years. While he has for much of this time been able to manage the disease, it has created several complications for him over the last couple of years. The two most significant issues related to his diabetes are: 1) he has developed sharp, shooting pains almost all the time in his rib cages which is a form of diabetes neuropathy, and 2) his blood sugar level has become much more difficult to manage in the last year. His doctor has now moved him to daily insulin injections.

Second, six months ago, Stuart developed a growth (on his left vocal cord) in his throat, which was causing coughing and swallowing issues. It was surgically removed. The doctor believes it needs to be monitored closely. A complication from the surgery was damage to his bladder, which has rendered him partially incontinent. As a result, Stuart needs to wear Depends to avoid soiling himself. As his treating nurse practitioner states in her letter, this condition is "extremely disturbing" to Mr. Millner and will occur "if a restroom is not readily available." As the Court is likely aware, unlimited permission to constantly visit the men's room is not generally a luxury for inmates.

Third, on December 17, Stuart slipped on ice, fell straight back and landed on the edge of the step. He fractured two vertebrae, T11/T12, and cracked three ribs. The ribs are healing, but the doctor has said the vertebrae need to be watched for several more months to ensure that they heal properly.

Fourth, Stuart has developed a tremor in left hand.  The doctors have yet determined the cause.

Fifth, a heart murmur has developed within the last year. Moreover, within the last month, he has had a cardiac procedure done to address AFIB and his aortic regurgitation. As his cardiologist stated in his letter, "[d]ue to his ongoing cardiac issues, [Mr. Miller] will require frequent monitoring as well as ongoing systemic anticoagulation to reduce his risk of a cerebrovascular accident."

Sixth, he has an enlarged prostate that needs to be checked every four months.

Stuart takes the following list of medications on a daily basis.

1. Escitopram /Lexapro at night to try to subdue the anxiety during the day.

2. Victoza…. Daily injections for his diabetes.

3. Cyclobenzaprine for back pain spasms.

4. Omeprazole for acid reflux.

5. Losartan for high blood pressure.

6. Atorvastatin for cholesterol management.

7. Metformim XR (twice daily) for diabetes.

8. Lorazepam (Ativan)…. As needed for anxiety.

9. Lidocaine Patch (.4%) for nerve damage to rib muscles.  Every 12 hours.

10. Ambien for sleeping, which he has found he cannot do without medication.

Finally, Stuart has experienced significant emotional issues involving anxiety and depression. As reflected in Dr. Salazar's letter to the Court, these issues arose before the Government's execution of its multiple search and seizure warrants in August 2015. Stuart is suffering from "panic attacks, palpitations, dyspnea, tremor and persistent insomnia . . . depressed mood, low energy, hopelessness, shame, guilt, intermittent despair and passive suicidal ideation." There should be little debate that his struggles have been real. "He has spent the past year struggling with huge losses in his life: loss of life's work, financial security and ability to support himself, sense of home, peer and professional relationships, sense of identity and purpose in life.  He has dealt with damaged relationships in his family and watched his wife's health deteriorate, because of these events."  *See*, Salazar Letter.

### G.    The Nature and Circumstances of the Offense.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall,* at 51, (quoting, *Koon v. United States*, 518 U.S. 81, 113 (1996)); *see also, United States v. Fry*, 792 F. 3d 884, 890 (8th Cir. 2015).  "Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  In *Pepper*, the Court quoted *United States v. Bryson*, 229 F.3d 425, 426 (C.A.2 2000), "[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Id*., at 492.

While Mr. Millner does not intend to diminish the wrongfulness of his actions, we hope it is clear to the Court that the facts of this case demonstrate that Mr. Millner was not intending to cause harm to those who became victims as result of his conduct. First, and foremost, three of the four Counts before the Court involve one loan from one bank. Mr. Millner has dutifully made

every monthly payment on that loan, and at this point,[5] the bank has suffered no loss.[6] There always was, and still remains, the intent to make full payment on his bank loans.

As to the handling of the auction proceeds, there is no dispute that around 2014, SBMA and Stuart's other investments began experiencing serious financial difficulties. Some, but not all, of SBMA's contracts with their customers called for the auction proceeds to be placed in escrow. In order to make full payment to earlier customers, Mr. Millner did sometimes use the proceeds from one customer to pay off a different customer. A misguided confidence led Stuart to believe he could right the ship, make the company successful again, and bring the payment schedule back into full compliance with his contractual obligations. The intent was to eventually pay all his customers. As the Government stipulated within the "Undisputed Facts," "Millner knowingly caused SBMA to use funds derived from the sale of B.P.C.'s property *to pay debts owed to other companies* on whose behalf SBMA had previously held auction." Guilty Plea Agreement, page 7 (emphasis added). Even within the "Disputed Facts," the Government's allegation is essentially the same, that funds were: "misappropriated by SBMA *in order to pay debts owed to earlier clients of SBMA's, as well as to pay debts and obligations owed to other creditors and to fund SBMA's operations*." *Id.*, at 8. (emphasis added); and "at the time the promises were made, Millner intended instead to use the Client Proceeds obtained from the sale of particular clients' property *to pay debts owed to earlier clients of SBMA's, as well as to pay other debts and other obligations of SBMA's and to fund its operations*. *Id.*, at 8.

Between 2014 and August 28, 2015 (the day of the search warrant), SBMA held 40

---

[5] Mr. Millner acknowledges that misrepresentations in financial statements can impact the decision to make a loan, and therefore his conduct may have put the bank at greater risk of a possible future loss.

[6] Under the disputed facts, the Government discusses a second bank loan. Again, Mr. Millner has made every monthly payment on that loan, and that bank has lost no money.

different auctions. The Government has identified 13 clients who are still owed money. We submit this is strong evidence that Stuart's intent was to pay his clients.

Stuart had always been highly successful in his given profession. For a multitude of reasons, however, SBMA hit on hard times. Stuart came to a crossroad where the appropriate decision would have been to give up, close down his business, and accept retirement. However, as mentioned above, a misguided confidence led him to keep on trying to make things work. He now will forever regret his decisions and the harm they have caused people who trusted him. But, unlike many of those who come before this Court, though he admittedly misled some of his clients, he was attempting to pay them all.

## H. Stuart Has Endured Significant Consequences Without Any Need for Imprisonment.

As reflected in the Presentence Report, Stuart and his wife have lost almost all their worldly possessions. On August 28, 2015, the Government executed multiple seizure warrants and took control of every bank account in either his name or that of his companies. SBMA immediately went out of business. The Millners lost all sources of income other than their Social Security checks. Their home was foreclosed on, their automobiles seized, and their lives changed forever. While Mr. Millner continues to operate Garvin Business Center, (owned by the entity Garvin Industrial Associates), and it pays for his automobile expenses, he receives no income from the operation.

The search and seizure warrants, the indictment, and now the guilty plea all received significant media attention, both in print and television. In their town of Union, Missouri, everyone immediately learned of the news. The humiliation endured by Stuart has been tremendous.

It can be argued that Stuart brought this all on himself, but nevertheless, the impact has been monumental. Importantly, the impact on both Stuart's and his wife's health and mental well-being has been nothing short of life-changing.

Notwithstanding these new heavy burdens, Stuart has fought to maintain what is most important to him - his family. As relayed to the Court by his son Andrew:

*"It is telling that even with the loss of the physical home that we have known and loved over the years our family celebrated Thanksgiving together where my Dad and Bren are renting. They turned their garage into an amazing celebration of food, twinkle lights, music and decorations."*

The seriousness of the offense is fully reflected in the consequences which have already fallen upon him. Mr. Millner hopes the Court will consider that an appropriate punishment which is "sufficient, but not greater than necessary," has already been put upon him.

With the exception of the charged conduct, he has lived a lifetime as a man who provided for his four children, and now continues to be a caregiver to his spouse. Clearly, the burden of incarceration at his stage of life is more burdensome, and much harsher than considered by the guidelines.

## I.     At Least One "Victim" Will Benefit if Mr. Millner Does Not Go to Prison.

Garvin Business Center is the one remaining business Stuart has been allowed to retain. Within the Government's "Disputed Facts" is referenced a $3,000,000 loan from StanCorp Mortgage Investors to Garvin. As with the Ridgestone Bank loan, all monthly payments have been made. While Stuart is trying to teach his wife how to run the business in case he is sent to prison, she is not comfortable with her ability to keep the company afloat. There is every reason to believe that Stuart will be able to keep Garvin operating, and continue to make all monthly payments to StanCorp. That may not be possible if he is in prison.

Stuart's wife, Bren, has never been an active member in the operation of Garvin. It is now the only asset of value left in the possession of Stuart and Bren. Though current sale of Garvin would merely recoup enough to pay off the outstanding loans, it is a viable business which provides a small amount of support for the two of them. Stuart has been spending the last six months trying to coach Bren so that she can take over the operation of Garvin if that becomes necessary as a result of these proceedings.

However, the stress of the last two years has taken a significant toll on Bren both physically and emotionally. Though very capable in her own right, she has indicated to Stuart that she cannot handle the added stress of trying to manage Garvin. Bren is 68 years old and suffers from Supraventricular tachycardia, which is an abnormally fast heart rhythm arising from improper electrical activity in the upper part of the heart. She has been averaging an attack a week. The heart begins to race over 150 bpm. To avoid having to rush to the hospital each time this occurs, Bren was taught to turn her body upside down with her feet above her head and bear down. If that does not work, Stuart takes her to the emergency room. Understandably, these attacks are exhausting.  Therefore, we submit that allowing Stuart to remain free to monitor his wife's health and keep Garvin running are valid reasons to support the variance we seek.

**J.    Other Section 3553 Factors Support a Substantial Reduction of the Guideline Range.**

Consideration of the other factors in §3553 also supports a substantial reduction in Stuart's possible sentence.  First, it is clear imprisonment is not needed to either protect the public from further crimes of the defendant, §3553(a)(2)(C), or to provide Stuart with education or vocational training, §3553(a)(2)(D).

On the other hand, a defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  *See, e.g., United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Additionally, when considering the history and characteristics of Stuart, see §3553(a)(1), his compassion and generosity of his time and his money clearly support a lenient sentence.  He has led a near-blameless life, while delivering goodness to many less fortunate than himself.  And, added to all the other considerations, a sentence of probation is justified and is in the best interest of the judicial system, as well as the parties involved in this case.

The nature and seriousness of the offenses do not call for severe punishment, see §3553(a)(1) and (2)(A).

### K.   Deterrence is Not a Compelling Factor.

While in many cases deterrence of others may be the one factor, see §3553(2)(B), which could be argued to go against a sentence of probation, consideration of deterrence, at least in this case, does not justify ruling out a sentence of probation. The negative impact of this felony conviction, as discussed above, has a dramatic deterrent affect without any need to send Stuart to prison.  Moreover, the subordination of deterrence as to other §3553 factors has been validated by the Courts, see *U.S. v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008)[7].

### L.   Imprisonment Will Financially Devastate His Wife.

The Millner's are living off of their Social Security payments, two thirds of which are paid to Stuart. Should he be imprisoned, his payments are terminated. This would leave Bren Millner with almost no ability to cover bare minimum living expenses.

---

[7]"In any event, we question the force of the Government's deterrence argument, even when it is considered in isolation.  Although *Gardellini* may have been treated leniently, the next similarly situated tax offender cannot expect the same treatment.  Another defendant in this same situation might well receive an above-Guidelines sentence.  In light of the discretion afforded to district courts by the Supreme Court's sentencing decisions, only a fool would think that he or she necessarily would receive the same sentence as *Gardellini* for a similar tax offense." (emphasis added).

## CONCLUSION

Stuart Millner will stand before the Court a humbled man with great regret and remorse for his actions which bring him before the Court. He is well aware of the shame he has brought upon himself, the embarrassment he has brought upon his family, and the financial harm he has caused his former clients. But, there is much more good and positive about Stuart than there is bad.

Since *Gall*, the clear mandate to a sentencing judge is to consider the "totality of the circumstances."  Therefore, the extraordinarily generous, compassionate, uniquely personal, and, undeniably from the heart, works of charity which Stuart has done for years, long before there was any criminal investigation, the significant negative impact a sentence of imprisonment would have on his wife, the pain and repercussions he has already suffered, and the other factors within §3553 set out above, fully support and fully justify a sentence of probation.

Respectfully submitted,

DOWD BENNETT LLP

By:  */s/ James G. Martin*
      James G. Martin       #33586MO
      7733 Forsyth Blvd., Suite 1900
      St. Louis, MO 63105
      314/889-7300 (Telephone)
      314/863-2111 (Facsimile)
      jmartin@dowdbennett.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 13, 2017, a copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.

*/s/ James G. Martin*