UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16CR00153 CDP |
| | ) | |
| STUART B. MILLNER, | ) | |
| | ) | |
| Defendant. | ) | |

## THE UNITED STATES' SENTENCING MEMORANDUM

This Court should sentence Defendant Stuart B. Millner to a sentence of 60 months incarceration, the maximum permitted under his plea agreement (Doc. #68). The crimes for which Millner has pled guilty are serious, resulting in millions of dollars of losses to more than a dozen victims who entrusted Millner's company to sell their property, when Millner all along intended to use their auction proceeds to pay his company's creditors and enrich himself. Any consideration that Millner deserves because of his age, health, or upbringing have already been adequately accounted for by the United States' agreement that Millner not be subject to more than 60 months incarceration for crimes that, under the Guidelines, would ordinarily merit a sentence as much as twice as long. For those reasons, the United States respectfully requests that the Court impose a sentence of 60 months incarceration against Millner in order to fully satisfy the purposes of punishment set forth in Title 18, United States Code, Section 3553(a).

**OVERVIEW OF THE OFFENSES**

Stuart Millner was an auctioneer. For more than two decades, Millner's company, Stuart B. Millner & Associates ("SBMA"),[1] conducted large-scale auctions for the sale of industrial equipment, auctions which frequently garnered hundreds of thousands—and sometimes millions—of dollars at a time. Like most auctioneers, Millner profited from these auctions by making commissions, both from the seller of the item, which Millner called a "Project Management Fee," and from the buyer of the item, which Millner termed the "Buyer's Premium."

When Millner's clients contracted with SBMA for the sale of their goods, they fully expected that Millner would take his commissions and remit the remaining proceeds from the sale to them. Millner's contracts with his clients expressly promised them that they would receive the proceeds of their sales, less commissions, within 31 days after the sale was completed, along with a complete accounting of the prices the items had sold for. In some cases, Millner expressly told his clients that their funds would be kept by SBMA in "trust," and he even created an "Escrow Account" at the Bank of Sullivan where his clients' proceeds were regularly deposited. There, Millner told his clients, their money would be kept safe until it was paid out to them within the allotted time.

But unbeknownst to his clients, Millner had other plans. In auction after auction, Millner took the proceeds that he had promised would be paid to his clients and misdirected them to other uses, including, most notably, the repayment of prior clients whose auction proceeds he had previously pocketed. In effect, Millner ran SBMA like a Ponzi scheme, treating the SBMA "Escrow Account" like a piggy bank that he could use to pay whichever creditor was barking loudest. When clients demanded their money, Millner invented false excuses, telling them that his

---

[1] "Stuart B. Millner & Associates" is a fictitious registration for a corporation called Watson Road Holding Company. The abbreviation "SBMA" is used herein for ease of reference.

2

company had fallen victim to a fraud by one of his employees, promising to pay back their lost proceeds in installments over the months to come. *See, e.g.*, **Ex. A** (Millner's email directing an employee to tell Berry Plastics Corporation that SBMA was investigating a "fraud attempt in the range of one million dollars"). What Millner did not tell his clients was that the only fraud at SBMA was being perpetrated by Millner himself.

The evidence in this case demonstrates beyond the shadow of a doubt that Millner knew that his actions were wrongful, even criminal, and that he nonetheless persisted for years in drawing new victims into his scheme. The plainest demonstration of Millner's consciousness of guilt comes from Millner's own lips, in the form of a recording made by one of his employees only three days before the execution of the search warrants in this case. In that recording, Millner can be heard to say:

> I know what the right thing to do is with Benteler, I mean with, um, Castle, very similar to what we did with Graham, is that the proceeds of their sales go to into a special Castle account. . . . The problem that we deal with in that endeavor is the endeavor of not having the money available to take care of other obligations that we have. It's not a question of wanting to not do that, it's a question of, it's a question of, um, how do we manage our obligations, our responsibilities, if we don't have that kind of money available except profit, which, by the way, we probably should be operating all of the—all the time on that basis. But we got ourselves into this pickle, and we have obligations to Berry and Benteler and other people that need to be taken care of.

In this recording, the Court is given an unusually clear glimpse into Millner's criminal mindset. Millner begins by acknowledging the wrongfulness of his actions ("I know what the right thing is to do"), recognizing that he should put the proceeds from an upcoming auction (the "Castle" auction) into a separate account where they could be kept safe until it was time to pay the seller. And yet, in the next breath, Millner expresses his intent to use those proceeds not to pay the seller as he had promised, but to "take care" of "other obligations," namely, the repayment of prior

3

victims that Millner had defrauded: "Berry" (Berry Plastics Corporation) and "Benteler" (Benteler Automotive Corporation), both of whom are identified as victims in this case. Millner's own words strongly suggest that, if not for the execution of a search warrant on Millner's business three days after this recording was made, "Castle" would have joined Berry and Benteler as another in the long line of victims to fall prey to Millner's scams.

Millner's profligate misuse of auction proceeds is neatly captured by a phrase that one witness described as a "slogan" for SMBA's operations: "UOPM"—an abbreviation for "use other people's money." Millner repeated this expression to numerous employees over the years, in one case even writing it down on a piece of paper and handing it to one of his employees. *See* **Ex. B** (Millner's handwritten note reading "UOPM"). In using that slogan, Millner expressly acknowledged his own understanding of the nature of the funds that had been entrusted to his care: it was "other people's money." Yet despite that recognition, Millner instructed his employees to "use other people's money" to pay his company's other debts. While Millner's use of that expression seems at times to have verged on the cavalier, the wrongfulness of his actions still weighed heavily on his conscience during the scheme. That is demonstrated by numerous personal reflections that Millner drafted entitled "My Prayers and Needs," in which he expressed his desire that he be "found not guilty of conversion of other people's money." *See, e.g.*, **Ex. C** (document titled "My Prayers and Needs," dated February 8, 2015).

Millner's lies were not limited to the false promises that he told his clients before he auctioned off their property. Millner also dramatically misrepresented to at least one client, Benteler Automotive Corporation, the price at which one of its items had sold at auction. That item, an AIDA Press, had brought in $650,000.00 at auction (inclusive of the "Buyer's Premium"). Millner reported to Benteler, however, that the item had sold for only $517,500.00, allowing

4

Millner to pocket the difference. Even after blatantly lying to Benteler about the sale price for the AIDA Press, Millner proceeded to pay Benteler only about $250,000.00 of the more than $1.2 million it were owed, making it the largest victim of Millner's crimes.

Millner kept his debts to his victims secret from all except those whom he had already victimized. On two separate occasions, Millner applied for multi-million-dollar bank loans in connection with large real estate transactions by two of his related companies, Garvin Industrial Park, LLC, and Columbus Business Center, LLC ("CBC"). In both cases, Millner submitted financial statements reporting no debt for SBMA and valuing the company at $3 million, a number that more closely approximated the company's debts than its value. In one case, Millner dummied up a loan agreement between CBC and "Machinery Mart," a company that Millner invented to create the illusion for the bank that CBC already had a rent-paying tenant. In yet another example of Millner's misuse of client proceeds, Millner used funds obtained from clients in SBMA's auction business to fund monthly "rent" payments to CBC, in order to make it appear that Machinery Mart was indeed a legitimate tenant of CBC's.

Taken in total, the relevant conduct in this case reveals Millner as a calculating criminal who deliberately sought out new victims day in and day out, knowing that he did not intend to do "the right thing" with their auction proceeds, but intended instead to use those proceeds to pay "other obligations"—the debts he owed to prior clients. For years, Millner concealed his crimes from his creditors and from his clients, even expressing his intentions to scam yet another victim only days before the FBI came to his company's door. Throughout the scheme, Millner remained driven by an unflinching determination to "use other people's money" to keep his operation afloat and to enrich himself. To exhibit such callous disregard for the trust that Millner's clients had placed in him is a serious offense that demands a serious sentence from this Court.

## APPLICATION OF 18 U.S.C. § 3553(a)

In applying Title 18, United States Code, Section 3553(a) to Millner's case, this Court is asked to take into consideration, *inter alia*, the "nature and circumstances of the offense," the "history and characteristics of the defendant," and the "need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Millner has accepted the determination of the Presentence Investigation Report (Doc. #74) ("PSIR") that his total offense level is 30. In the ordinary case, given his lack of criminal history, Millner's crimes would have called for a sentence of at least 97 and not more than 121 months under the U.S. Sentencing Guidelines. In this case, however, Millner's plea agreement provides that he will not be sentenced to more than 60 months incarceration.

The United States does not dispute that there are certain considerations in Millner's case that might justify a sentence outside of the Guidelines range. The facts recited in the PSIR relating to Millner's age, health, and upbringing are certainly factors that this Court might justifiably consider in evaluating Millner's "history and characteristics," which is one among several factors the Court is called upon to consider under § 3553(a). Indeed, Millner's history and characteristics were the very factors that motivated the United States to agree to a plea under Federal Rule of Criminal Procedure 11(c)(1)(C) in the first instance, including, most especially, Millner's advanced age. In view, however, of the seriousness of Millner's crimes, the United States respectfully submits that those factors are not adequate to justify a further reduction in Millner's sentence from the 60-month ceiling already established by the plea agreement.

As reflected in the PSIR, Millner's crimes have resulted in losses in excess of $3.2 million to thirteen victims, all of whom arranged for SBMA to auction their goods and had the proceeds of their auctions stolen from them. To several of these victims, the losses are very substantial,

6

including significant losses to Benteler Automotive Corporation ($1,110,908.79), Berry Plastics Corporation ($663,397.24), and Briggs & Stratton Products Group ($465,835.00). The total amount of funds that the United States recovered from SBMA's accounts and the sale of other seized property, meanwhile, totals less than $300,000.00, meaning that, in the event that property is forfeited and restoration is granted, Millner's victims stand to recover less than ten percent of the value of the property he sold for them.[2]

The PSIR also reflects that Millner obtained approximately $6 million from financial institutions in connection with his bank fraud offenses, which loans, although they currently appear to be fully secured, were nonetheless obtained based upon gross misrepresentations of the financial condition of Millner and his companies. The PSIR further states that Millner abused his position of trust in connection with his operation of SBMA and that he was the organizer or leader of his company's fraudulent operations. The resulting base offense level of 33 (before considering acceptance of responsibility) reflects a judgment by the drafters of the U.S. Sentencing Guidelines that Millner has committed very serious crimes.

Despite the seriousness of his crimes, however, Millner's plea agreement already provides that his sentence in this case shall not exceed 60 months incarceration. That is a sentence corresponding to the high end of the Guideline range for a total offense level of 24, the offense level that would apply in a similar case where the losses were less than $250,000.00. In this case, Millner cost his victims more than a dozen times that amount.

---

[2] This assessment does not consider the value of the Columbus Business Center property, which, although it is currently subject to this Court's preliminary order of forfeiture, is also subject to claims by Byline Bank and United Bank of Union that may ultimately impair the United States' ability to obtain additional recovery from the proceeds of a sale of that property.

The sentence of 60 months recommended by the United States thus represents a variance of more than three years from the low end of the otherwise-applicable Guidelines range. As such, the United States respectfully submits that a sentence of 60 months is sufficient but not greater than necessary to serve the statutory purposes of punishment set forth in Title 18, United States Code, Section 3553(a), including especially the "need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence against Millner of 60 months incarceration.

Dated: June 13, 2017

Respectfully submitted,

CARRIE COSTANTIN
Acting United States Attorney

 */s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
Assistant United States Attorney
111 South 10th Street, Suite 20.333
Saint Louis, Missouri 63102
Telephone:  (314) 539-2200

**CERTIFICATE OF SERVICE**

    I hereby certify that on June 13, 2017 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
Assistant United States Attorney