UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16CR00153 CDP |
| | ) | |
| STUART B. MILLNER, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES'**
**RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

In Defendant Stuart Millner's sentencing memorandum (Doc. #80), Millner states as follows:

> In 2001, Stuart started Stuart B. Millner & Associates (SBMA), a very successful business growing to a size of 15 employees. Then, *in 2014*, SBMA began to have financial difficulties. The challenges at first were small and appeared very manageable. However, as months went by, the projections Stuart had counted on to bring things back in the black did not pan out.

Def.'s Sent. Mem. (Doc. #80) at 10 (emphasis added). Defendant makes similar claims later in his memorandum, indicating that it was not until "*around 2014* [that] SBMA and Stuart's other investments began experiencing serious financial difficulties." Def.'s Sent. Mem. (Doc. #80) at 17 (emphasis added).

In reality, Millner's fraud began well before 2014, as reflected by the undisputed facts recited in the PSIR (Doc. #78), which both parties have accepted (Doc. #75, #76). Paragraph 14 of the PSIR indicates that "between *2010* and 2015, Stuart B. Millner . . . devised and participated in a scheme to defraud . . . clients and creditors of SBMA through the use of materially false representations, pretenses, and promises" (emphasis added). Paragraph 22 indicates that "between *August 2010* and August 2015, Millner, working through SBMA, intentionally devised and carried

1

out a scheme to defraud clients by means of false representations" (emphasis added). Indeed, the losses for one of the victims reflected in the PSIR, Dynegy Inc., relate to an auction that was conducted by SBMA in November 2011.[1]

While it is true that auctions for the other victims listed in the PSIR were all performed after January 1, 2014, the only reason that earlier victims are not owed restitution is that Millner misdirected proceeds from the listed victims' auctions in order to repay the delinquent debts that he owed those earlier victims as a result of his prior executions of the scheme. That, of course, is the nature of a Ponzi scheme: the brunt of the loss usually falls on the last victims to be brought into the scheme, because those who entered the scheme earlier have been repaid by contributions from those later victims.

Contrary to Millner's suggestion, this Ponzi-like activity did not start in 2014. Millner's own internal company records show that by the end of 2010, debt resulting from past due client proceeds had already grown to $967,000.00. *See* **Ex. D** (spreadsheet reflecting $967,000.00 in "Client Proceeds-Past"); **Ex. E** (Millner email acknowledging accuracy of **Ex. D** with respect to "old payables"). By the end of 2013, the outstanding proceeds owed to clients had ballooned to more than $1.9 million. *See* **Ex. F** (email attaching spreadsheet showing $1,905,674.00 in "proceeds due" as of December 31, 2015). To call these debts "small" and "manageable" is a dramatic understatement. *See* Def.'s Sent. Mem. (Doc. #80) at 10.

It is true, of course, that most of the victims who were owed money at the end of 2013 were ultimately made whole, but only at the cost of losses to new victims who entered the scheme at a

---

[1] To the extent that Millner now disputes the veracity of these portions of the PSIR, the United States is prepared to present additional evidence at sentencing, including witnesses if necessary, to support the PSIR's findings.

later date. Taking a view of the scheme as a whole, it is clear that SBMA's "financial difficulties" were not some sudden catalyst that caused Millner to start scheming; rather, it is Millner's scheming that caused the financial difficulties in the first place.

SBMA is not a company that went from being "successful" in 2014 to suddenly finding itself $3.2 million in the hole less than two years later. Instead, since at least 2010, Millner operated SBMA under a single, unchanging principle: "use other people's money." Every day for at least six years, in auction after auction, Millner acted on that principle by diverting new auction proceeds to slowly pay back the clients he had previously defrauded. However sincere Millner may profess to have been in his wishes to pay back his victims during the scheme, the dramatic growth of SBMA's proceeds problem over the span of years shows that he always intended to steal more than he repaid.

The auctioneer's business model is a simple one: sell the goods, take a commission, and pay the remainder to the client. As long as the auctioneer limits funding for his operations to the commissions he's been promised, he should always have the cash available to pay his clients what they are owed, on time. But Millner was not satisfied with his commissions. Each year, he took more and more, and the hole got deeper and deeper. The trend did not reverse: the rate at which Mr. Millner repaid his victims was repeatedly outpaced by the rate at which he stole from them. That is how the past due debts grew from $967,000.00 in 2010, to $1.9 million by the end of 2013, and ultimately to $3.2 million by August 2015.

This is not the story of a man who "was trying everything to make sure his customers were paid what they were owed" but simply "tried too hard." Def.'s Sent. Mem. (Doc. #78) at 11. Were that the case, one would expect to see Millner take less and less out of auctions to fund his own salary and operations and dedicate more and more of his own commissions to paying back his

victims. Instead, as the years went by, Millner took more and more from his clients than he was entitled to, and paid them less and less. It is those decisions, and nothing else, that caused SBMA—and Millner's many victims—to "hit on hard times." Def.'s Sent. Mem. (Doc. #80) at 18.

Millner suggests that "an appropriate punishment which is 'sufficient, but not greater than necessary,' has already been put upon him" in the form of the financial ruin and humiliation he has endured as a result of the detection of his offense. Def.'s Sent. Mem. (Doc. #80) at 19. As Millner himself acknowledges, "[i]t can be argued that Stuart brought this all on himself." *Id.* Yet once again, Millner dramatically understates the case. Millner has brought the consequences of his fraudulent conduct not only upon himself, but upon more than a dozen victims, at a price of more than $3.2 million, very little of which they are ever likely to see repaid. And as eager as Millner appears to be to point to external events to justify and explain his own wrongful choices, in the end, Millner has no one else to blame for the yet heavier loss he has visited upon his innocent victims.

Although Millner attempts to place the moment far too recently in time, there no doubt was a moment where Millner did indeed "c[o]me to a crossroad where the appropriate decision would have been to give up, close down his business, and accept retirement." Def.'s Sent. Mem. (Doc. #80) at 18. At any time over the course of the last many years, Millner could have admitted to those who had defrauded that he did not intend to return their money to them as promised but instead to take that money for himself. As noted above, Millner could also have tightened his belt, cut his own income, moved out of his million-dollar home, and paid back his victims as best he could using only the commissions he had earned.

But instead, Millner chose the darker path. He sought out new victims, one after another, hoping to capture their business and thus find a new source of cash to power the scheme. In part,

to be sure, Millner did this so that he could pay back his prior victims, several of whom were "calling daily" after their money, *see* **Ex. F**—but for every dollar that he paid back between 2010 and 2015, he stole three more. As this Court is well aware, fraudsters will do what they must to forestall detection of their schemes, but that should not be confused with honest intentions.

This Court should not permit Millner's self-serving and late-coming lamentations sway its view of the punishment that is deserved for the serious harm that Millner has visited upon so many, and over so many years. For these and all the other reasons stated in its Sentencing Memorandum, the United States respectfully requests that this Court impose a sentence against Stuart Millner of 60 months incarceration.

Dated: June 16, 2017

Respectfully submitted,

CARRIE COSTANTIN
Acting United States Attorney

 */s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
Assistant United States Attorney
111 South 10th Street, Suite 20.333
Saint Louis, Missouri 63102
Telephone:  (314) 539-2200

5

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2017 the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

 */s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
Assistant United States Attorney